## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PATRICK SUN, On Behalf of Himself and All Others Similarly Situated, | ) ) | Case No. _____ |
| | ) | JURY TRIAL DEMANDED |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| TUMI HOLDINGS, INC., CLAIRE M. BENNETT, CHRISTOPHER J.L. FIELDING, JEROME GRIFFITH, JOSEPH R. GROMEK, THOMAS H. JOHNSON, MICHAEL J. MARDY, ALEXANDER W. SMITH, SAMSONITE INTERNATIONAL S.A., and PTL ACQUISITION INC., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT FOR VIOLATION OF SECTIONS 14(a) AND 20(a)
## OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action stems from a proposed transaction announced on March 4, 2016 (the "Proposed Transaction"), pursuant to which Tumi Holdings, Inc. ("Tumi" or the "Company") will be acquired by Samsonite International S.A. ("Parent") and its wholly-owned subsidiary, PTL Acquisition Inc. ("Merger Sub," and together with Parent, "Samsonite").

2.      On March 3, 2016, Tumi's Board of Directors (the "Board" or the "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement"), pursuant to which stockholders of Tumi will receive $26.75 per share in cash.

3.     On March 24, 2016, defendants issued materially incomplete and misleading disclosures in the Preliminary Proxy Statement (the "Proxy") filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.  The Proxy is deficient and misleading in that it fails to provide adequate disclosure of all material information related to the Proposed Transaction.

4.     Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.     This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Tumi common stock.

9.     Defendant Tumi is a Delaware corporation and maintains its principal executive offices at 1001 Durham Avenue, South Plainfield, New Jersey 07080.  The Company designs, produces, and markets various travel and business products and accessories.  Tumi's common

stock is traded on the NYSE under the ticker symbol "TUMI."

10.     Defendant Claire M. Bennett ("Bennett") has served as a director of Tumi since January 2013.  According to the Company's website, Bennett is a member of the Audit Committee and the Nominating and Corporate Governance Committee.

11.     Defendant Christopher J.L. Fielding ("Fielding") is a director of Tumi.  According to the Company's website, Fielding is a member of the Compensation Committee.

12.     Defendant Jerome Griffith ("Griffith") has served as a director, President, and Chief Executive Officer ("CEO") of Tumi since April 2009.

13.     Defendant Joseph R. Gromek ("Gromek") has served as a director of Tumi since April 2012.  According to the Company's website, Gromek is Chairman of the Board, Chairman of the Compensation Committee, and a member of the Nominating and Corporate Governance Committee.

14.     Defendant Thomas H. Johnson ("Johnson") has served as a director of Tumi since April 2012.  According to the Company's website, Johnson is Chairman of the Audit Committee and a member of the Compensation Committee.

15.     Defendant Michael J. Mardy ("Mardy") has served as a director of Tumi since November 2011.  According to the Company's website, Mardy is Chief Financial Officer ("CFO") and Executive Vice President of Tumi.

16.      Defendant Alexander W. Smith ("Smith") is a director of Tumi.  According to the Company's website, Smith is Chairman of the Nominating and Corporate Governance Committee and a member of the Audit Committee.

17.     The defendants identified in paragraphs 10 through 16 are collectively referred to herein as the "Individual Defendants."

18.     Defendant Parent is a public limited liability company incorporated in Luxembourg.

19.     Defendant Merger Sub is a Delaware corporation and a wholly-owned subsidiary of Parent.

## SUBSTANTIVE ALLEGATIONS

***Background of the Company***

20.     Tumi was founded in 1975 and is a global, premium lifestyle brand whose products offer superior quality, durability, functionality, and innovative design.

21.     The Company offers a comprehensive line of travel and business products and accessories in multiple categories, building on its strong heritage of producing high-end performance travel goods and business cases.

22.     Tumi utilizes multiple distribution channels, including retail, wholesale, and e-commerce.  This multi-channel approach focuses on points of distribution that foster and enhance the Tumi brand.  The Company sells its products directly to consumers through a global network of 130 company-owned locations, consisting of full-price stores strategically positioned in high-end retail malls or street venues, outlet stores in premium outlet malls, and its e-commerce websites.

23.     Tumi also sells its products indirectly to consumers through various channels that include partner stores, its global wholesale distribution network of specialty luggage retailers, prestige department stores and business-to-business channels, retail concessions within prestige department stores, and third-party e-commerce sites.

24.     The Company designs its products in its U.S. design studios and selectively collaborates with well-known, international industrial and fashion designers for limited edition product lines.  Production is sourced globally through a network of suppliers based in Asia, many

of which are longtime suppliers, and the Caribbean.

25. Tumi offers travel and business products as well as accessories. Travel products include wheeled and soft carry-on luggage, garment bags, totes, duffels, wheeled packing cases, and travel kits. Business products include business cases, day bags, and totes. Accessories include small leather goods and travel electronics.

26. On August 5, 2015, the Company issued a press release wherein it announced its financial results for the second quarter ended June 28, 2015. For the second quarter, Tumi reported that net sales increased 11.2% to $138.5 million from $124.6 million in the second quarter ended June 29, 2014. On a constant currency basis, net sales grew 13.9%. Gross margin increased 13.2% to $81.6 million from $72.1 million in the second quarter of 2014. Operating income increased 27.3% to $25.3 million from $19.9 million in the second quarter of 2014. Net income increased 36.8% to $16.7 million, or $0.25 per diluted share, from $12.2 million, or $0.18 per diluted share, in the second quarter of 2014. During the quarter, Tumi opened nine new stores, and at June 28, 2015, Tumi operated 164 company-owned stores.

27. For the six months ended June 28, 2015, Tumi reported that net sales increased 6.8% to $249.0 million from $233.2 million in the corresponding period of 2014. Gross margin increased 8.7% to $146.9 million from $135.2 million in the corresponding period of 2014. Operating income increased 4.8% to $34.8 million, from $33.2 million in the first six months of 2014. Net income increased 13.4% to $23.1 million, or $0.34 per diluted share, from $20.4 million, or $0.30 per diluted share, in the first six months of 2014.

28. With respect to the financial results, Individual Defendant Griffith, Tumi's CEO and President, commented:

> Our strong financial results in the second quarter were driven by sales growth of 11%, gross margin expansion of 100 basis points, operating income growth of 27%,

and net income growth of 37%. Our performance was led by strength in our retail business worldwide, as well as the continued momentum in our international wholesale segment. We remain focused on continuing to execute our growth initiatives, including introducing innovative new products and growing our footprint worldwide, driving brand awareness and attracting new consumers to the Tumi brand globally. Overall, we are well positioned to drive sustainable sales and earnings growth over the long term.

29.     On November 4, 2015, the Company issued a press release wherein it announced its financial results for the third quarter ended September 27, 2015. For the third quarter, Tumi reported that net sales increased 4.4% to $136.0 million on a constant currency basis compared to $130.2 million in the third quarter ended September 28, 2014. Gross profit increased 3.9% to $79.3 million compared to $76.3 million in the third quarter ended September 28, 2014. Operating income increased 9.4% to $25.4 million on a constant currency basis compared to $23.3 million in the third quarter ended September 28, 2014. Net income increased 16.6% to $16.2 million on a constant currency basis, or $0.24 per diluted share, from $13.9 million, or $0.21 per diluted share, in the third quarter of 2014. During the third quarter, Tumi opened nine new stores, relocated one store, and renovated one store. At September 27, 2015, Tumi operated 172 company-owned stores.

30.     For the nine months ended September 27, 2015, Tumi reported that net sales increased 7.7% to $391.4 million on a constant currency basis compared to $363.4 million in the corresponding period of 2014. Gross profit increased 7.0% to $226.2 million compared to $211.5 million in the corresponding period of 2014. Operating income adjusted for the Company's cost reduction program and on a constant currency basis increased 11.7% to $63.1 million compared to $56.5 million in the first nine months of 2014. Net income increased 19.8% to $41.1 million, or $0.61 per diluted share, compared to $34.3 million, or $0.51 per diluted share, in the first nine months of 2014.

31.     With respect to the financial results, Individual Defendant Griffith commented:

Tumi enjoyed an operationally strong quarter with positive direct to consumer comparable store growth in North America full price stores and all international direct to consumer channels in local currency. We also continue to build upon our international expansion strategy, and are announcing an agreement to acquire the remainder of our Japanese joint venture, which will provide us with the opportunity to manage and grow that business directly. While we continue to face the same external headwinds that are impacting the global retail sector generally, we believe that the core tenets of our strategy are solid and we will continue to focus on expanding our brand and develop our superior product offerings to position us to deliver heathy, sustainable growth and shareholder value over the long-term.

32.     On January 6, 2016, the Company announced that it completed its acquisition of the remaining 50% stake in its Japanese joint venture, Tumi Japan.  According to the press release, the Company expects the acquisition to be accretive to earnings after 2016.  With respect to the acquisition, Individual Defendant Griffith commented:

This acquisition further strengthens Tumi's position within the Japanese and Asia Pacific region. We have been pleased with the strong acceptance of our brand among Japanese consumers and remain excited about the long-term growth prospects of this region. We look forward to welcoming the Tumi Japan team into the Tumi family and look forward to integrating this region into the business, sharing our expertise, brand power, and retail strategy to drive it to the next level.

33.     On February 24, 2016, Tumi issued a press release wherein it announced its financial results for the fourth quarter and full year ended December 31, 2015.  For the fourth quarter, the Company reported that net sales increased 2.3% to $167.7 million compared to $163.8 million in the fourth quarter ended December 31, 2014.  On a constant currency basis, net sales increased 4.4%.  Gross profit increased 6.6% to $100.7 million compared to $94.5 million in the fourth quarter ended December 31, 2014.  Operating income increased 5.4% to $38.9 million from $36.9 million in the fourth quarter of 2014.  Excluding certain expenses, adjusted operating income was $40.0 million, an increase of 8.4%.  On a constant currency basis, adjusted operating income increased 12.3%.  Net income was $25.1 million, or $0.37 per diluted share, compared to net income in the fourth quarter of 2014 of $23.7 million, or $0.35 per diluted share.  Adjusted net

income was $25.8 million, or $0.38 per diluted share, an increase of 8.8%, in the fourth quarter of 2015.  On a constant currency basis, adjusted diluted earnings per share increased 12.7%.  During the fourth quarter of 2015, Tumi opened six new stores and renovated four stores.  At December 31, 2015, Tumi operated 177 company-owned stores.

34.    For the year ended December 31, 2015, the Company reported that net sales increased 3.9% to $547.7 million compared to $527.2 million in year ended December 31, 2014. On a constant currency basis, net sales increased 6.7%.  Gross profit increased 6.8% to $326.9 million compared to $306.0 million in the corresponding period of 2014.  Operating income increased 3.7% to $96.9 million from $93.4 million in the year ended December 31, 2014. Adjusted operating income was $100.8 million, an increase of 7.9%.  On a constant currency basis, adjusted operating income increased 12.3%.  Net income was $63.0 million, or $0.93 per diluted share, compared to net income in the year ended December 31, 2014 of $58.0 million, or $0.85 per diluted share.  Adjusted net income was $65.5 million, or $0.97 per diluted share, an increase of 13.0%.  On a constant currency basis, adjusted diluted earnings per share increased 17.2%.

35.    With respect to the financial results, Individual Defendant Griffith commented:

In fiscal 2015, we delivered revenue growth on a constant currency basis of 6.7%, adjusted EPS growth on a constant currency basis of 17.2%, drove significant gross margin expansion while protecting our brand in a promotional environment, and continued to push forward on our multiple growth initiatives. In addition, we announced plans to buy the remaining 50% stake of our Japanese JV, which we closed in early 2016. Looking ahead, we will continue to make strategic investments to support our long-term growth initiatives and remain deeply committed to creating innovative products with exceptional quality and functionality for the global citizen. We are also committed to growing our direct-to-consumer distribution worldwide through store openings, particularly in the international markets, as well as through the expansion of our global e-commerce platform. In 2015, we opened 27 new stores, and expanded our e-commerce platform to 18 countries globally. Finally, we will focus our marketing programs and brand building initiatives on creating a deeper connection with our core customers and on extending our global reach. Overall, we are excited about the growth opportunities ahead of us.

***Background of the Proposed Transaction***

36.     According to the Proxy, in late 2014, Griffith (CEO and President of Tumi) and Ramesh Dungarmal Tainwala ("Tainwala") (then-Chief Operating Officer, now CEO, of Samsonite) had several discussions during which Tainwala suggested a potential merger between the companies.  On May 12, 2015, Samsonite submitted a non-binding preliminary indication of interest regarding a potential acquisition of Tumi for $26.00-28.00 per Tumi share in cash.

37.     On May 15 and June 1, 2015, the Board met with representatives of Goldman, Sachs & Co. ("Goldman Sachs"), who at such time had not been formally engaged by Tumi with respect to the Samsonite matter but had provided investment banking services to Tumi in the past, and discussed, among other things, Samsonite's proposal and Tumi's five-year plan.  Following discussion, the Board determined to reject Samsonite's May 12, 2015 proposal.  In response, Tainwala proposed signing a nondisclosure agreement and receiving access to non-public information with respect to Tumi.

38.     On September 1, 2015, Samsonite submitted a letter to Tumi that reaffirmed its interest in a potential transaction.  The letter indicated that Samsonite had "conviction at the high end of [its] previous range at $28 per share."  It further indicated that, assuming Samsonite was "given appropriate access, and depending on the results of [its] due diligence, [Samsonite] may be able to offer a price of up to $30.00 per share."

39.     On September 10, 2015, the Board met and discussed the September 1, 2015 letter from Samsonite.  After discussion, the Board authorized Goldman Sachs to discuss with Samsonite's financial advisor, Morgan Stanley Asia Limited ("Morgan Stanley"), the terms under which Tumi would permit a due diligence review of Tumi.  On September 23, 2015, a nondisclosure agreement, which included standstill provisions, was executed by Samsonite and

Tumi.  On September 24, 2015, Tumi permitted Samsonite to access due diligence material.

40.     On October 13, 2015, Morgan Stanley informed Goldman Sachs that, given then current market conditions, Samsonite was unlikely to value Tumi in the range of $28.00 to $30.00 per share.  In light of that information, on October 13, 2015, Samsonite's access to due diligence was terminated and Tumi discontinued contact with Samsonite.

41.     On November 6, 2015, Tumi received a letter from Samsonite indicating an "updated, non-binding indication of interest" in pursuing an acquisition of Tumi by Samsonite. The letter indicated a price of $26.00 per share, indicated that Morgan Stanley was prepared to finance the transaction but that Samsonite would seek "competitive proposals from other lenders in parallel with confirmatory due diligence and the negotiation of a definitive acquisition agreement," and also included an outline of certain key terms to be included in the definitive acquisition agreement.  The Company rejected Samsonite's proposal and Samsonite subsequently submitted a revised acquisition proposal for $26.75 per share.  On November 10, 2015, the Board met and determined to proceed with negotiations with Samsonite on the basis of the $26.75 per share proposed by Samsonite.

42.     In November 2015, legal counsel for each of Tumi and Samsonite traded drafts of a merger agreement.  Tumi's draft of the merger agreement contemplated, among other things, acceleration and cashout of awards under employee equity plans.  Apparently, there were no discussions or negotiations regarding a go-shop period, despite the fact that the Board apparently did not consider reaching out to other potentially interested parties at this time.

43.     On November 19, 2015, Tumi executed an engagement letter with Goldman Sachs in connection with the Samsonite proposal and with respect to the possible purchase of Tumi by Samsonite or any other party.  Pursuant to the engagement letter, Tumi agreed to pay Goldman

Sachs, among other things, a transaction fee of approximately $21 million, all of which is contingent upon consummation of the Proposed Transaction.

44.     During a telephone call on November 30, 2015 and in a subsequent e-mail on December 1, 2015, Tainwala indicated to Griffith that Samsonite had been unable to receive financing commitments on reasonable terms and requested that Tumi grant Samsonite an eight week period to give the debt markets a chance to return to normalcy.  On December 1, 2015, the Board met to discuss the developments that had occurred and instructed Tumi management to cease discussions with Samsonite.

45.     In early January 2016, Tumi executives met with representatives of an undisclosed major investment bank (which was not formally retained by Tumi) to discuss strategic alternatives for Tumi.  The Proxy fails to disclose the reason Tumi met with this bank rather than Goldman Sachs, including whether there were any perceived conflicts of interest on the part of Goldman Sachs or concerns regarding Goldman Sachs' performance.  After discussion, Tumi determined to approach another company in the premium branded product industry, referred to as "Company A," to determine its interest in a merger.  After Griffith met with the CEO of Company A on February 3, 2016 to discuss the possibility of such a combination, there were no further discussions between Tumi and Company A.

46.     On February 1, 2016, the November 2015 engagement letter between Tumi and Goldman Sachs was terminated.

47.     On February 18, 2016, Samsonite sent a formal letter to the Board proposing a merger transaction at $26.00 per Tumi share.  Samsonite indicated that it was prepared to obtain financing commitments and perform confirmatory due diligence with a goal of "moving expeditiously toward signing of definitive documentation" by March 1, 2016.  Following a

February 26, 2016 Board meeting where the Board discussed, among other things, the Company's promising standalone plan, Tumi rejected Samsonite's proposal.

48.     On February 27, 2016, Samsonite sent a letter to the Board presenting a "best and final offer of $26.75 per share."  The letter contained revised draft financing commitments for the financing at the higher price.  On February 29, 2016, the Board met to consider Samsonite's February 27, 2016 proposal and authorized Tumi management and advisors to negotiate and take other actions with respect to finalizing a draft definitive merger agreement.

49.     On March 2, 2016, Tumi executed a letter that reengaged Goldman Sachs with effect from February 16, 2016.  On March 3, 2016, the Board met to consider the Samsonite offer and the terms of the draft merger agreement.  Representatives of Goldman Sachs delivered Goldman Sachs' opinion that the $26.75 per share merger consideration was fair, from a financial point of view, to the Company's stockholders.  The Board subsequently determined to approve the Merger Agreement, which was executed by both parties later that day.

50.     The Merger Agreement contains a "no solicitation" provision that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 6.02(a) of the Merger Agreement states:

> (a) Except as expressly permitted by this Section 6.02, during the Pre-Closing Period, the Company shall not, and shall cause its Affiliates and its and their directors, officers and employees, and shall direct and otherwise use its reasonable best efforts to cause its and their respective other Representatives not to, directly or indirectly (i) initiate, solicit, authorize or encourage, or facilitate the submission or making of, any Acquisition Proposal, or any inquiry, expression of interest, proposal, offer or request for information that could reasonably be expected to lead to or result in an Acquisition Proposal, (ii) other than informing Third Parties of the existence of the provisions contained in this Section 6.02, participate or engage in negotiations or discussions (other than, for a period of no more than four (4) Business Days (such period to be calculated by reference to Business Days in NY) after receipt of an Acquisition Proposal, solely to the extent necessary for the

Company Board to be able to have sufficient information to make the determination described in  Section 6.02(b), to ascertain facts or clarify terms with respect to an Acquisition Proposal that did not result from a breach (other than in any immaterial respect) of this Section 6.02), or furnish any information concerning the Company or any of its Subsidiaries to, any Third Party relating to an Acquisition Proposal or any inquiry, expression of interest, proposal, offer or request for information that could reasonably be expected to lead to or result in an Acquisition Proposal, (iii) enter into any Contract or other agreement or understanding (written or oral, binding or non-binding, preliminary or definitive) relating to an Acquisition Proposal or (iv) resolve or agree to do any of the foregoing. From and after the execution and delivery of this Agreement, the Company shall, and shall cause its Affiliates and its and their respective Representatives to, (A) immediately cease and cause to be terminated all discussions or negotiations with any Person existing on the date hereof with respect to any Acquisition Proposal, or any inquiry, expression of interest, proposal, offer or request for information that could reasonably be expected to lead to or result in an Acquisition Proposal, (B) terminate access by any Third Party to any physical or electronic data room or other access to data or information of the Company, in each case relating to or in connection with, any Acquisition Proposal or any potential Acquisition Transaction, (C) request the prompt return or destruction of all information provided to any Third Party in year immediately preceding the date of this Agreement in connection with any inquiry, expression of interest, proposal, offer or request for information that could reasonably be expected to lead to or result in an Acquisition Proposal or a proposed Acquisition Transaction and (D) enforce, and not waive or modify, the provisions of any existing confidentiality or non-disclosure agreement entered into with respect to any Acquisition Proposal or any potential Acquisition Transaction, including any standstill provisions contained therein. The Company shall ensure that its Representatives and the Representatives of its Affiliates are aware of the provisions of this Section 6.02, and it is agreed that any violation of the restrictions set forth in this Section 6.02 by any Representative of the Company or any of its Affiliates shall constitute a breach of this Section 6.02 by the Company. The Company hereby releases Parent from its obligation to comply with the standstill provisions contained in Section 6 of the Confidentiality Agreement from and after the date hereof.

51.     Section 6.02(a) of the Merger Agreement requires the Company to "enforce, and not waive or modify, the provisions of any existing confidentiality or non-disclosure agreement entered into with respect to any Acquisition Proposal or any potential Acquisition Transaction, including any standstill provisions contained therein."

52.     Further, pursuant to Section 6.02(f) of the Merger Agreement, the Company must advise Samsonite, within twenty-four hours, of any proposals or inquiries received from other

parties, including, *inter alia*, the material terms and conditions of the proposal and the identity of the party making the proposal.  Section 6.02(f) of the Merger Agreement states:

> (f) From and after the execution and delivery of this Agreement, the Company shall promptly (and in any event (i) within 24 hours following the date of receipt if such date of receipt is a Business Day in NY or (ii) by the end of the next Business Day in NY immediately following the date of receipt if such date of receipt is not a Business Day in NY) advise Parent in writing in the event that it or any of its Affiliates, any of its or its Affiliates' officers, directors or employees or, to the Company's Knowledge, any of its or its Affiliates' Representatives receives any Acquisition Proposal, and in connection with such notice, provide to Parent the material terms and conditions (including the identity of the Third Party making any such Acquisition Proposal, copies of any documentation, including copies of any related financing commitments and fee letters) of any such Acquisition Proposal. From and after the execution and delivery of this Agreement, the Company shall keep Parent promptly informed in writing on a reasonably current basis of the status of, and any material changes to, the terms of any such Acquisition Proposal (including providing Parent a notification in writing within twenty-four (24) hours following any determination by the Company Board pursuant to Section 6.02(b) or any material changes to the terms of any such Acquisition Proposal) and any discussions and negotiations concerning the material terms and conditions thereof and (ii) provide to Parent as soon as practicable (and in any event (i) within 24 hours following the date of receipt if such date of receipt is a Business Day in NY or (ii) by the end of the next Business Day in NY immediately following the date of receipt if such date of receipt is not a Business Day in NY) after receipt thereof of any written indication of interest (or amendment thereto) or any written material received in connection therewith (or amendment thereto), including copies of any proposed Alternative Acquisition Agreement (including any drafts thereof) and any proposed financing commitments and fee letters related thereto (including drafts thereof).

53.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Samsonite a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 6.02(e) of the Merger Agreement provides:

> (e) Notwithstanding anything to the contrary contained in this Agreement, the Company shall not be entitled to terminate this Agreement pursuant to Section 6.02(d) or Section 8.01(d)(i), unless (x) the Company shall have provided to Parent four (4) Business Days' prior written notice (the "Superior Proposal Notice") advising Parent that the Company intends to take such action (and specifying, in reasonable detail, the reasons for such action and the terms and conditions of any

such Superior Proposal, including the identity of the Third Party who has made such Superior Proposal) and provided Parent a copy of the relevant proposed transaction agreement or the latest draft thereof (including any related financing commitments and fee letters) or, if no such agreement or draft exists, a written summary of the material terms and conditions of such Superior Proposal, and any other related available documentation and correspondence relating to such Superior Proposal (including any related financing commitments and fee letters), and (y):

(i) during such four (4) Business Day period, if requested by Parent, the Company shall have engaged in good faith negotiations with Parent (and the Company shall have caused its Affiliates and its and their directors, officers and employees and directed its and their other Representatives, including, without limitation, its outside legal counsel and outside independent financial advisors, to have engaged in good faith negotiations with Parent and its Representatives) regarding changes to the terms of this Agreement intended to cause such Acquisition Proposal to no longer constitute a Superior Proposal; and

(ii) the Company shall have considered any Proposed Changed Terms proposed by Parent no later than 11:59 p.m., New York City time, on the fourth (4th) Business Day of such four (4) Business Day period and shall have determined in good faith (after consultation with its outside legal counsel and outside independent financial advisors) that the Superior Proposal would continue to constitute a Superior Proposal if such Proposed Changed Terms were to be given effect.

The parties acknowledge and agree that, (A) if Parent, within four (4) Business Days following its receipt of a Superior Proposal Notice, makes a proposal that, as determined in good faith by the Company Board (after consultation with its outside counsel and outside independent financial advisors), results in the applicable Acquisition Proposal no longer being a Superior Proposal, then the Company shall have no right to terminate this Agreement pursuant to Section 6.02(d) or Section 8.01(d)(i) as a result of such Acquisition Proposal, and (B) any (1) revisions to the financials terms or any other material terms of a Superior Proposal or (2) revisions to the financial terms or any other material terms to an Acquisition Proposal that the Company Board had determined no longer constitutes a Superior Proposal, shall constitute a new Acquisition Proposal and shall in each case require the Company to deliver to Parent a new Superior Proposal Notice and a new four (4) Business Day period shall commence thereafter; provided, however, that such new four (4) Business Day notice period shall be shortened to the longer of three (3) Business Days and the time remaining on the prior notice period if the only change to the material terms of such Superior Proposal is an increase in (without any change to the form of) the per share merger consideration. The Company shall have no right to terminate this Agreement pursuant to Section 8.01(d)(i) unless it has complied with the procedures set forth in Section 6.02(d) and this Section 6.02(e).

54.     The Merger Agreement also contains a provision for a "termination fee" of $54.7

million, payable by the Company to Samsonite if the Individual Defendants cause the Company to terminate the Merger Agreement.

55.     Furthermore, certain of the Company's directors and officers stand to receive significant benefits in connection with the Proposed Transaction.

56.     For example, it appears that Tumi's management team will stay on with the post-merger company.  In the press release announcing the Proposed Transaction, Individual Defendant Griffith stated, "[W]e are excited for our employees to benefit from opportunities presented by being part of a larger and more diversified global company.  Samsonite has successfully grown many unique brands and we look forward to the next chapter in Tumi's great history as part of the Samsonite family."  The Merger Agreement contemplates a retention program with a retention pool of up to $3.5 million.

57.     Additionally, Griffith stands to receive nearly $9.74 million in golden parachute compensation in connection with the Proposed Transaction, and Mardy stands to receive over $2.7 million.    Steven M. Hurwitz (Tumi's Senior Vice President – Product Development, Manufacturing and Sourcing), Peter L. Gray (Executive Vice President and General Counsel), and David J. Riley (Chief Accounting Officer and Senior Vice President, Finance) stand to receive an additional nearly $6.1 million.

**The Materially Incomplete and Misleading Proxy**

58.     Defendants filed the Proxy with the SEC in connection with the Proposed Transaction.  As alleged below and elsewhere herein, the Proxy omits material information that must be disclosed to Tumi's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

59.     The Proxy omits material information with respect to the process and events leading

up to the Proposed Transaction, as well as the opinions and analyses of Tumi's financial advisor, Goldman Sachs.  This omitted information, if disclosed, would significantly alter the total mix of information available to Tumi's stockholders.

60.    For example, with respect to Tumi's financial projections, the Proxy fails to disclose the Company's projected unlevered free cash flows for years 2016 through 2024 for each of Tumi's November and Revised Projections.  The disclosure of this information is material for two reasons.  First, the Company's stockholders are being asked to vote their shares in favor of the Proposed Transaction and to forgo participating in the Company's promising future earnings and growth.  As such, stockholders are entitled to understand the Company's future prospects and cash flows when making that decision.  Second, the Company's unlevered free cash flow projections are a key input in Goldman Sachs' Discounted Cash Flow Analysis.  The Proxy states that, in performing its Discounted Cash Flow Analysis, Goldman Sachs relied on "estimates of unlevered free cash flow for the Company for the years 2016 through 2024, as reflected in the forecasts. . . ."  The unlevered free cash flows, however, were not disclosed to stockholders.  Moreover, the Proxy fails to disclose all of the necessary line items used to calculate unlevered free cash flows; namely, the Proxy fails to disclose the Company's projected capital expenditures and changes in net working capital for years 2016 through 2024.

61.    The Proxy also fails to disclose material information relating to certain of Goldman Sachs' financial analyses.  The full disclosure of this information is important to stockholders because the financial advisor's analyses address the most important issue to stockholders – the sufficiency of the consideration being offered in the Proposed Transaction.

62.    In particular, with respect to Goldman Sachs' Discounted Cash Flow Analysis, the Proxy fails to disclose the inputs and assumptions underlying Goldman Sachs' weighted average

cost of capital ("WACC") analysis, from which it determined the discount rate range that was applied.  The disclosure of this information is important because the WACC assumptions typically have a substantial impact on the DCF's output, with even slight variations producing meaningful differences in valuation.  Additionally, the Proxy fails to disclose the exit multiples implied by Goldman Sachs' Discounted Cash Flow Analysis, which are important because they are used as a cross-check to test the efficacy of the assumptions selected and relied upon by Goldman Sachs.

63.     With respect to Goldman Sachs' Selected Transactions Analysis, the Proxy fails to disclose the individual transaction multiples, as well as any other benchmarking statistics, observed by Goldman Sachs in performing its analysis.  The disclosure of the observed multiples and benchmarking statistics is necessary because they are crucial elements of the precedent transactions analysis, as this analysis is fundamentally based on comparison and relative valuation. The disclosure of this information, moreover, is particularly important here because there is such a wide range between (i) the dates of the transactions observed by Goldman Sachs (April 2004-September 2014) and (ii) the multiples of the transactions observed by Goldman Sachs (8x-19.4x). Without this information, stockholders cannot assess the reasonableness or reliability of Goldman Sachs' analysis.

64.     The Proxy also fails to disclose whether Goldman Sachs performed a comparable companies analysis, which is one of the analyses that are typically performed when valuing companies in similar acquisitions.

65.     The Proxy states that Goldman Sachs "had provided investment banking services to Tumi in the past," but it fails to disclose the nature of those services, as well as the compensation received for those services.  The disclosure of this information is material to stockholders because Goldman Sachs played a central role in the evaluation of the Proposed Transaction and, therefore,

stockholders are entitled to the full disclosure of investment banker compensation and all potential conflicts.

66.    The Proxy further fails to disclose the timing and nature of all communications regarding future employment or directorship of Tumi's officers and directors, including who participated in all such communications.

## COUNT I

### Individual Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Tumi

67.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

68.    The Individual Defendants disseminated the false and misleading Proxy, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  Tumi is liable as the issuer of these statements.

69.    The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy.

70.    The Individual Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

71.    The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to stockholders.

72.     The Proxy is an essential link in causing plaintiff to approve the Proposed Transaction.

73.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

74.     Because of the false and misleading statements in the Proxy, plaintiff is threatened with irreparable harm.

## COUNT II

### Individual Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Samsonite

75.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

76.     The Individual Defendants and Samsonite acted as controlling persons of Tumi within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Tumi and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

77.     Each of the Individual Defendants and Samsonite was provided with or had unlimited access to copies of the Proxy alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

78.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged

herein, and exercised the same.  The Proxy contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly in the making of the Proxy.

79.     Samsonite also had direct supervisory control over the composition of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.

80.     By virtue of the foregoing, the Individual Defendants and Samsonite violated Section 20(a) of the 1934 Act.

81.     As set forth above, the Individual Defendants and Samsonite had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiff is threatened with irreparable harm.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.     Directing the Individual Defendants to file a Proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: April 19, 2016                    **LEVI & KORSINSKY, LLP**

                                         By:   s/ Donald J. Enright_____
                                               Donald J. Enright
                                               235 Main Street
                                               Hackensack, NJ 07601
                                               (973) 265-1600

                                               *Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
Gina M. Serra
Jeremy J. Riley
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310